## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FORT SMITH DIVISION

**CITY OF OZARK, ARKANSAS,**
**a municipal corporation**                                    **PLAINTIFF**

**V.**                              **Case No. 2:14-CV-02196**

**UNION PACIFIC RAILROAD COMPANY**                    **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

Now pending before the Court are a Motion for Summary Judgment (Doc. 37) filed by Defendant Union Pacific Railroad Company ("Union Pacific"); a Motion for Partial Summary Judgment (Doc. 45) filed by Plaintiff City of Ozark, Arkansas ("Ozark" or "the City"); and a Motion to Exclude the Testimony of Ozark's expert witness George Solis (Doc. 66), filed by Union Pacific. All Motions were fully briefed, and the Court has considered all responses, replies, and supporting exhibits. Further, the Court held a hearing on August 28, 2015, and at that time, counsel for the parties made presentations to the Court regarding their respective motions, and the Court made its own inquiries of counsel. Now that the issues are ripe for decision, the Court rules as follows: Union Pacific's Motion for Summary Judgment (Doc. 37) is **DENIED**, Ozark's Motion for Partial Summary Judgment (Doc. 45) is **GRANTED**, and Union Pacific's Motion to Exclude Testimony (Doc. 66) is **MOOT**.

## I. BACKGROUND

### A. History of the Crossing

This case concerns the fate of what was once an asphalt-covered, at-grade easement over Union Pacific's railroad tracks, located just east of the train depot in Ozark,

-1-

Arkansas.  Ozark is a city in Franklin County, situated along the banks of the Arkansas River at the southern edge of the Ozark Mountains, in an area known as the "River Valley." Ozark was settled in the 1830s and was first incorporated in 1850, just prior to the Civil War.  In the mid- to late-1800s, the original predecessor to Union Pacific, a company known as the Little Rock and Fort Smith Railway ("LR&FSR"), began constructing railroad tracks from Little Rock, Arkansas, to Fort Smith, Arkansas, by way of Ozark's downtown. The LR&FSR built a depot in Ozark and continued laying tracks throughout Franklin County during the late nineteenth century.

Ozark continued to develop well into the early twentieth century, as neighborhoods and businesses cropped up along the Arkansas River.  The railroad crossing at issue in this lawsuit ("the Crossing") was a relatively simple one, in that it did not have flashing lights or gates, but instead consisted of asphalt planks, or slabs, that covered the tracks at a location the City calls "Oliver Street."[1]  The Crossing provided the means for the public to access a small neighborhood south of the tracks and east of the train depot, as well as a horse barn, a lumber company, propane tanks, and the city's dump.  Although the parties are not certain when the Crossing was first established, it appears on the maps of Union Pacific's predecessor, Missouri Pacific Railroad Company, as early as June 30, 1916.

In the late 1960s or early 1970s, the United States Army Corps of Engineers ("the Corps") flooded the river, bringing the water level much closer to the tracks.  The small neighborhood and few businesses formerly situated on the other side of the Crossing

---

[1] Union Pacific disputes whether "Oliver Street" existed as a platted, dedicated city street; however, as will be explained further in this Order, for purposes of evaluating these cross-motions for summary judgment, the status of "Oliver Street" is immaterial.

ceased to exist after the flood, and the public's use of the Crossing grew more infrequent after then.

Sometime around 2000 or 2001, Scott James, an Ozark resident, complained to Mayor Todd Timmerman and/or one or more members of the City Council about the noise of the train whistle at the Crossing. Mayor Timmerman spoke with a representative of Union Pacific and asked that the Crossing be removed. At some point thereafter, Mayor Timmerman went to the City Council and informed them that the Crossing would, indeed, be removed. No Council member voiced an objection to Mayor Timmerman's announcement. Even so, the question of closing the Crossing was never put to a Council vote during a regular meeting, and the Council did not pass an ordinance concerning the Crossing.

Union Pacific closed the Crossing in 2001, spending "several thousand dollars" of its own funds to tear out the asphalt covering the tracks. (Doc. 43, p. 38). The railroad later installed a side track at the Crossing for storing train cars and facilitating train meets. Ozark stipulates that this side track is now the longest storage track on the Van Buren subdivision, running between Little Rock and Van Buren, Arkansas.

The instant lawsuit was prompted by Ozark's current desire to develop the area along the Arkansas River, just south of the Crossing, into a series of hiking and biking trails. According to Ozark, this development plan cannot come to fruition unless the Crossing is reopened. Ozark maintains that the Crossing was closed contrary to Arkansas law, on the authority of Mayor Timmerman alone, and therefore must be reopened to allow the public to access the river and any riverfront amenities that Ozark might build. For its part, Union Pacific maintains that the Crossing was closed legally—but even if the Court

-3-

were to find that the Crossing was closed contrary to law, it is Union Pacific's position that the City took too long to complain about the closing and should now be estopped from challenging it. Union Pacific also argues that federal law governing the operation of the country's railroads should preempt any State-law cause of action that has been asserted by the City.

## B. Procedural History

This case made its way to this Court after a long period of negotiations, meetings, and exchanges of letters by the parties concerning the closing of the Crossing. As early as December 14, 2004, three years after the Crossing was closed, Ozark Mayor C.L. Coley wrote to the Chief Engineer for Safety at the Arkansas State Highway & Transportation Department ("Arkansas Highway Department"), requesting that the Crossing be reopened for the purpose of accessing proposed riverfront development. Later, correspondence from 2005 indicates that the City, Union Pacific, and other State agencies were involved in discussions regarding the City's desire to reopen the Crossing and provide pedestrian access to the river. Discussions and meetings between the parties in 2009 and 2010 were followed by an exchange of letters in 2011 and 2012. Ultimately, the parties failed to come to a resolution of this dispute on their own.

The City originally filed this lawsuit in the Circuit Court of Franklin County, Arkansas, on August 11, 2014. The case was removed to this Court on September 17, 2014, and an Amended Complaint was filed on October 2, 2014. Shortly thereafter, Union Pacific and two former defendants, the Arkansas Highway Department and the Arkansas State Highway Commission, all submitted motions to dismiss the case. The Court granted the motion of the Arkansas defendants (Doc. 21) but denied Union Pacific's motion (Doc. 18).

The parties then engaged in discovery for several months and filed cross-motions for summary judgment, which are now before the Court for disposition. Ozark's Motion for Partial Summary Judgment asks the Court to declare as a matter of law that the Crossing was, prior to February of 2001, a "public crossing" that was removed or closed by Union Pacific without proper legal authority, as per Count I of the Amended Complaint (Doc. 14, pp. 42-46). According to the City, a public crossing can only be removed if a city council authorizes the removal through an affirmative vote and the passage of a written ordinance, as per the requirements of Ark. Code Ann. § 14-301-301. The City contends that Union Pacific did not comply with Arkansas law and instead closed the Crossing *only* upon the oral request of the City's mayor at the time, in spite of the fact that no affirmative vote of the City Council occurred and no ordinance was passed.

Ozark's Motion also asks the Court to grant summary judgment on the City's request for a permanent injunction. Count II of the Amended Complaint sets forth the City's claim that Union Pacific unreasonably interfered with the easement at the Crossing and also requests that the Court order Union Pacific to reestablish the Crossing at the railroad's sole cost and expense (Doc. 14, pp. 46-48). Count III of the Amended Complaint seeks to permanently enjoin Union Pacific from obstructing or interfering with the City's use of the Crossing. *Id.* at pp. 49-50.[2]

Union Pacific opposes granting a declaratory judgment to Ozark and contends that declaring the Crossing to have been either "public" or "private" at the time of the closing in

---

[2] The remaining Counts of the Amended Complaint are Count IV, which was previously dismissed, and Count V, which is an alternative claim for relief that will be rendered moot through the Court's rulings herein. The Court therefore finds that all claims in this case are capable of resolution on summary judgment, leaving no remaining claims for trial.

2001 would serve no useful purpose today.  Further, Union Pacific argues in its Motion for Summary Judgment that even if the Crossing were "public," the City slept on its rights and waited too long to file a lawsuit about these matters.  Along with arguing that the affirmative defense of laches applies here, Union Pacific also contends that Ozark either waived its right to complain about the closing of the Crossing or should be estopped from complaining because Union Pacific reasonably relied to its detriment on Mayor Timmerman's oral request to close the Crossing.  In so relying, Union Pacific points out that it spent its own funds to tear out the asphalt covering the tracks and then changed the nature of its rail operations at the site of the Crossing.

Union Pacific believes that reopening the Crossing now would create inefficiencies in the rail line as a whole, as well as safety concerns.  In particular, Union Pacific maintains that the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10101 *et seq.*, preempts the City's attempt to reopen the Crossing.  This is true, according to Union Pacific, because the ICCTA generally prohibits state and local governments from unreasonably interfering with railroad operations or taking any action that would pose undue safety risks.

Below the Court will consider, first, whether the undisputed facts developed in the summary judgment record show that the Crossing was either private or public, and if public, whether the closing of the Crossing by Union Pacific was accomplished in conformity with State law.  Next, the Court will consider Union Pacific's federal preemption argument concerning the ICCTA and the affirmative defenses of laches, waiver, and estoppel.

-6-

## II. LEGAL STANDARD

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The same standard applies where, as here, the parties file cross-motions for summary judgment. When there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). Each motion should be reviewed in its own right, however, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. DISCUSSION

### A. Was the Crossing Closed Lawfully?

#### 1. Character of the Easement

To answer the question of whether the Crossing was closed lawfully, the Court must first determine whether any dispute of material fact exists as to whether the Crossing was

originally designated either a public easement or a private easement. "A general definition of an easement is a right which one person has to use the land of another for a specific purpose. A right-of-way is an easement and is usually the term used to describe the easement itself or the strip of land which is occupied for the easement." *Loyd v. S.W. Ark. Utils. Corp.*, 264 Ark. 818, 825 (1979).

Contrary to Union Pacific's assertions, the Court finds that a legal declaration as to the public or private nature of the Crossing is necessary, as it has enormous consequences for both parties. First, this determination guides the Court's assessment of whether the Crossing was closed lawfully, and thus impacts all issues of liability in this case. And second, this determination is necessary to provide legal certainty to the parties going forward, as they assess their respective interests in this easement.

Union Pacific refuses to admit in its briefing that the easement at the Crossing was public and instead focuses on the City's alleged inability to definitively prove this fact using the City's own records. Union Pacific critiques the City's reliance on the Federal Railroad Administration's ("FRA") registry of crossings, which lists the Crossing as "public," and argues instead that the FRA's registry is widely regarded as unreliable. Finally, Union Pacific contends that the City was never granted an easement to use the Crossing in the first place because such an easement was never dedicated to the City by Union Pacific or its predecessors in interest—as evidenced by the City's apparent inability to locate documentation as to this dedication dating back to the early 1900s.

The Court finds it curious that Union Pacific insists that the only way the City can prove that the Crossing was public, rather than private, is by producing documents that everyone agrees do not exist, when the company's *own, authenticated maps* all indicate

-8-

that the Crossing was public.  These maps, issued by Union Pacific's predecessor in interest, Missouri Pacific Railroad Company, date as far back as 1916 and unequivocaly label the Crossing as "public."  See Doc. 47-1, p. 4 ("6406+84 Pub. X-ing" designation on Union Pacific's predecessor's map from 1916); Doc. 63-5, p. 36 (same designation on map from 1946); Doc. 53-6, p. 2 (map from 2000).[3]  From these maps, it is clear that Union Pacific knew or should have known that the Crossing was designated for public use and constituted a public easement across the railroad's tracks.  Union Pacific now attempts to disavow its own maps, questioning whether Ozark provided proper authentication for them, but the Court finds that the maps have, in fact, been properly authenticated through accompanying affidavits and constitute unrefuted summary judgment evidence of the public nature of the easement at the Crossing.

Moreover, the City has also produced evidence showing *the City's* conveyance of a right-of-way *to Union Pacific* for the purpose of placing railroad tracks in the area of the Crossing.  A City ordinance adopted in 1942 states that "Missouri Pacific Railroad Company . . . is hereby granted a right of way for the purpose of laying an industrial track over and across Second Street, over and across the alley between First and Second Streets, and over and across the southerly portion of Water or River Street . . . more clearly shown by the blueprint attached hereto and made a part of the ordinance . . . ." (Doc. 63-1, p. 15).  The blueprint, which the Court reviewed in color, and in a more legible format than

---

[3] Union Pacific's map designations noting the public, at-grade status of the Crossing exactly match the registry of crossings that was compiled by the FRA for the years 1970-2001.  See Doc. 52-3.  As noted previously, while Union Pacific argues that the FRA's registry is "not reliable and cannot be used as evidence for summary judgment" (Doc. 56, p. 7), this argument conveniently ignores the fact that the FRA's records as to the designation of the Crossing are the same as Union Pacific's.

that which appears in the paper and electronic record, *see* Doc. 63-1, p. 17, marks the location of the railroad tracks at the site of the Crossing.[4]

Section 14-333-101(a) of the Arkansas Code provides that "[t]he city council of any city of the first or second class and the town council of any incorporated town shall have power to grant to any railroad company a right-of-way through the streets of the city or town, with the right to establish and maintain depots and other necessary improvements in connection therewith." As explained herein, the Court finds from the evidence submitted by the City and from Union Pacific's own documents, it is clear as a matter of law that the Crossing was public and was committed to public use until such time that it was closed by Union Pacific in 2001.

## 2. Whether the Easement Was Abandoned

Perhaps sensing that it cannot establish contrary proof that the Crossing was private, Union Pacific next argues that the City must have abandoned its public easement after the Corps flooded the housing development south of the tracks in 1970, as little to no public purpose was served in crossing the tracks at that location after the flood. The case Union Pacific sites in support of this "abandonment" theory is *Shue v. Phillips*, 1989 WL 19303 (Ark. Ct. App. Mar. 1, 1989), which, according to Revised Arkansas Supreme Court Rule 5-2, is an unpublished opinion with no precedential value. Further, *Shue* involved the abandonment of the public's interest in a road obtained through prescriptive easement,

---

[4] Although Union Pacific maintains that it now owns the land over which the railroad tracks run "in fee simple absolute," it has provided no evidence to the Court to substantiate this claim; and, in any event, whether Union Pacific owns the land *under* the tracks has no bearing on whether Ozark's public easement *over* the tracks was removed in conformity with State law.

-10-

which Union Pacific agrees is not at issue here. *See* Union Pacific's Brief, Doc. 56, p. 19. The evidence of the public's alleged abandonment of the Crossing between 1970 and 2001 is heavily disputed by Ozark, as Union Pacific concedes in its brief. *See* Doc. 56, p. 9. For these reasons, the Court must construe the dispute of fact as to "abandonment" in favor of Ozark, the non-movant with respect to this argument.

Regardless, even if the Court were to assume the public did not use or only slightly used the Crossing after 1970, the case of *Bushmiaer v. City of Little Rock*, a published Arkansas Supreme Court opinion from 1960, explains that once a city street has become a public right of way, that right of way is irrevocable unless and until the city passes an ordinance to the contrary. 231 Ark. 848, 855 (1960) (finding that adverse possession and laches were not arguments that could defeat the city's right to open a city street). The Court also observes that the holding in *Thomas v. City of Little Rock*, 52 Ark. App. 24, 27 (Ark. Ct. App. 1996), is similarly persuasive and defeats Union Pacific's abandonment theory entirely. In *Thomas*, the Arkansas Court of Appeals determined that Ark. Code Ann. § 14-301-301 "gives cities of the first class the power and authority to vacate public streets and alleys." *Id.* Extending the reasoning in *Bushmiaer*, the *Thomas* court held that an easement dedicated for the use of the public cannot be lost through abandonment. 52 Ark. App. at 27. This rule is reasonable and is therefore applied to the facts in the case at bar, as to do otherwise would effectively invalidate the procedures set forth in § 14-301-301 for vacating the public's right of access to streets, alleys, and easements.

Because the Crossing was public, Union Pacific should have known that closing the Crossing would possibly entail more rigorous procedures than a mere oral request by the

-11-

Mayor.  Union Pacific, a sophisticated corporation, is assumed to have familiarity with applicable state and local law, particularly that which concerns the procedures necessary for closing railroad crossings.  *See United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971) ("The principle that ignorance of the law is no defense applies whether the law be a statute or a duly promulgated and published regulation.").

Accordingly, Union Pacific is assumed to be familiar with the procedures described at § 14-301-301(a), which was in force at the time the Crossing was closed, and which provides that "[c]ities of the first and second class and incorporated towns are given power and authority to vacate public streets and alleys within the cities and towns under the conditions and in the manner herein provided."  Those "conditions" referenced in the statute are:  (1) the approval of the closure decision by members of the city council through "a majority vote" and (2) the passage of an ordinance setting forth the terms by which "the rights of the public generally" are vacated.  Ark. Code Ann. § 14-301-304.  Applying this law to undisputed facts in this case, there is no genuine, material dispute that the site of the Crossing was a public easement and that Union Pacific was required to comply with the law before closing the easement to the public.[5]

---

[5] The City expends tremendous time and resources in attempting to prove through documentary evidence that the street which formerly bisected the tracks at the location of the Crossing and extended along the Arkansas River was a public street that was officially named and dedicated by the City for a public purpose.  The Court finds that the issue of whether *this street*—which the City contends was called "Oliver Street"—was, or was not, a dedicated, platted public street is irrelevant to the issue of whether *the easement* across Union Pacific's tracks was public or private.  Union Pacific agrees, as evidenced by its briefing on the matter.  *See* Union Pacific's Response in Opposition to City of Ozarks Motion for Partial Summary Judgment, Doc. 56, p. 8 ("First, it is irrelevant whether the street that went over the tracks was public, as the issue is the crossing.").  The Court further finds that public easements, such as are found in public, at-grade railroad crossings, are intended by the legislature to be vacated in the same manner as public

### 3. Compliance with Section 14-301-304

Now that the public nature of the easement at the Crossing has been resolved, the question becomes whether the Crossing was closed according to the procedures set forth in § 14-301-304.  Relying exclusively on Union Pacific's recitation of the facts surrounding the decision to close the Crossing, the Court will assume that one or more members of the City Council received complaints from a resident about the train whistle; that "Mayor Todd Timmerman received permission from the Council to speak with Union Pacific; that Timmerman asked Union Pacific to remove the crossing; [and] that Timmerman informed the Council, and no one made any objections to the removal.  Thereafter, Union Pacific took out the crossing." (Union Pacific's Brief in Support of its Motion for Summary Judgment, Doc. 43, p. 36).

In reviewing Union Pacific's characterization of the facts, it strikes the Court that even if none of the City Council members objected to closing the Crossing, their silence on the matter was not equivalent to an affirmative, public vote of the Council in favor of closing the public's easement.  Union Pacific concedes that no record exists of a Council vote on the matter, and no City ordinance regarding the closing of the Crossing was recorded.  Instead, Union Pacific relied exclusively on the word of the Mayor in making the consequential decision to close a public crossing that had been in existence for more than 80 years.  On this point, the Arkansas Supreme Court has held that "a public officer cannot bind the State or its subdivisions beyond the extent of his actual authority.  All who deal with a public agent must at their peril inquire into his real power to bind his principal."

---

streets and alleys, as per Ark. Code Ann. § 14-301-304.

*Bushmiaer*, 231 Ark. at 856 (quoting *Hankins v. City of Pine Bluff*, 217 Ark. 226, 229 (1950)).  The Mayor's oral permission—even if premised on a genuine, but erroneous, belief of his authority, and otherwise well intended—is simply not a substitute for proper compliance with Arkansas law.  Section 14-301-304 of the Arkansas Code required an affirmative vote and passage of a public ordinance.  It is undisputed that none of this occurred.  Judgment will enter on Count I of the Amended Complaint in Ozark's favor.

### B.  Do Union Pacific's Affirmative Defenses Preclude a Declaratory Judgment or the Issuance of an Injunction?

#### 1. Federal Preemption

Union Pacific argues that the ICCTA should operate in this case to completely preempt the City's claims for declaratory and injunctive relief.  The ICCTA is a "comprehensive regulatory scheme designed to deregulate the railroad industry and remove all state efforts to regulate railroads." *State of S.D. v. Burlington N. & Santa Fe Ry. Co.*, 280 F. Supp. 2d 919, 931 (D.S.D. 2003).

At first blush, it may appear that the ICCTA is germane here, as reopening the Crossing to the public would certainly impact rail operations in some manner, due in part to Union Pacific's use of a side track it installed at the area of the Crossing after 2001.  However, preemption is not at issue because the Crossing was not closed legally to begin with.  Union Pacific's decision to install the side track was made *after* the Crossing had been illegally removed, and, thus, at Union Pacific's own peril.  There is no need to examine whether reopening the Crossing would negatively impact train operations or result

in safety concerns,[6] as Union Pacific's lack of legal authority to close the Crossing is the controlling factor.  Federal preemption is not a valid affirmative defense, and summary judgment as to preemption is therefore **DENIED**.

As expert testimony on the preemption issue is unnecessary, given the Court's ruling above, Union Pacific's Motion to Exclude the Testimony of George Soliz (Doc. 66), Ozark's railroad expert on federal preemption, is **MOOT**.

### 2. Laches

The next affirmative defense Union Pacific presents is the equitable doctrine of laches.  To successfully invoke this defense, a defendant must prove by a preponderance of the evidence: (1) that the plaintiff delayed filing suit an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant; and (2) that the delay resulted in material prejudice or injury to the defendant. *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993).  According to Union Pacific, the City's delay in filing suit was so

---

[6] Throughout its briefing, Union Pacific references various safety concerns that may arise if the Crossing is reopened.  The Court's view is that returning the Crossing to its pre-closing condition should be a relatively straightforward remedy.  Union Pacific contends that its employees will face certain safety challenges after the Crossing is reopened, but those challenges should be no greater than they were prior to the Crossing's closing.  If Union Pacific claims that its employees will face *increased* safety concerns after the Crossing is reopened, due to Union Pacific's decision to change its operations at this location after 2001, those concerns must be addressed solely by Union Pacific, for the reasons already explained, *supra*.  As for Union Pacific's concerns about the public's safety, it is true that Ozark plans for the public to use the reopened Crossing in a manner that far exceeds the level of use between approximately 1970 and 2001.  However, the claims at issue in this lawsuit do not require the Court to either ratify or enjoin the City's proposed development plans for the riverfront area to the south of the Crossing.  In fact, the Court understands that any development plans must first be approved by the Corps, which owns the land along the Arkansas River.

unreasonable and inexcusable that any complaint the City now has about the illegality of closing the Crossing should be disregarded.

On summary judgment, the Court must examine whether any genuine dispute of material fact exists as to either of the two elements required to prove laches, while keeping in mind that laches was developed as an equitable defense in order to avoid "unfairness that can result from the prosecution of stale claims." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir. 1979).

The first element of laches asks whether a plaintiff delayed filing suit an unreasonable and inexcusable length of time from the time it knew or reasonably should have known of its claim. Union Pacific asserts that the City slept on its rights by "delaying 13 years to file this lawsuit." (Doc. 43, p. 37). The undisputed facts show that on December 14, 2004, three years after the Crossing was closed, the Mayor at the time, C.L. Coley, wrote a letter to the Chief Engineer for Safety at the Arkansas Highway Department, requesting the State's "approval for the reopening of a railroad crossing, for access to our proposed riverfront development," while also noting that "[t]he crossing was removed in 2002, in order to accommodate complaints by a resident about the noise of the train whistle." (Doc. 14-7, p. 55). Although Mayor Coley was mistaken about the date when the Crossing was closed, this letter clearly refers to the dispute at issue in this lawsuit and states the Mayor's belief that "there was no action taken by the Ozark City Council in support of the removal of the crossing." *Id.*

The next letter in the file, from February of 2005, documents that Union Pacific was involved in discussions with the City about the Crossing at some point before the letter was sent. In the letter, a representative of the Arkansas Highway Department writes to Mayor

Coley, referencing "a recent meeting with the Department, the City and the Railroad" regarding the City's desire to install a crossing to allow pedestrians access to the Arkansas River for "the proposed riverfront development." (Doc. 14-6, p. 19). The letter fails to state the date that this "recent meeting" took place, but the fact of the meeting is noted in the letter, and Union Pacific is silent in its summary judgment briefing about this contact, or any of the others, that took place between itself and Ozark in the 13 years that intervened between the closing of the Crossing and the filing of this lawsuit. Furthermore, Union Pacific does not point to any proof to show that this meeting or any other *did not* take place in 2004, 2005, or even earlier. *See Fatemi v. White*, 775 F.3d 1022, 1046 (8th Cir. 2015) (requiring that proof be met with proof on summary judgment in order to show a genuine issue of material fact).

The next piece of correspondence in the Court's file is a letter from Mayor Carol Sneath, dated June 30, 2011, and addressed to Mr. Charlie Felkins of Union Pacific, explaining the City's need for an at-grade crossing "to replace the one removed by UP in 2003." (Doc. 14-7, pp. 18-19). Despite Mayor Sneath's confusion in this letter about the year in which the Crossing was removed, it is clear that Mayor Sneath refers to the dispute that is the subject of this lawsuit.

Next, a reply letter from Mr. Felkins appears in the record, dated July 18, 2011, and references the parties attending "a number of meetings in Little Rock and Ozark, as recently as 2010 in which these issues were discussed in detail," as well as a "2009 letter" written by Union Pacific regarding its views about Ozark's riverfront development project and the City's interest in opening a crossing over Union Pacific's tracks. *Id.* at pp. 21-22.

A letter from August 20, 2012, from Mayor Sneath, addressed to Mr. Felkins,

-17-

references "Oliver Street, a long established city street leading to the cited land" that was "removed a few years ago by UP Railroad." *Id.* at p. 24. This letter also notes, without specifying a particular date, that "[p]revious efforts to reopen the street rail crossing or to agree on an alternative rail crossing have failed." *Id.*

After August of 2012, it is clear that the parties exchanged correspondence regarding the Crossing dispute, including on October 23, 2012, *id.* at pp. 26-27; November 13, 2012, *id.* at pp. 29-30; and November 30, 2012, *id.* at pp. 32-34. This lawsuit was filed on August 11, 2014.

In reviewing the above evidence, the Court finds that there is no dispute of fact that the City and Union Pacific have been in nearly constant communication regarding this dispute over the past decade. Furthermore, even if the evidence did show that Ozark "slept on its rights" by failing to file suit after it reasonably should have known of its claims, Union Pacific would still not prevail on its laches defense for two reasons. First, as the parties were actively negotiating an out-of-court solution to the Crossing dispute, any delay by the City in filing suit was not unreasonable or inexcusable. Only unreasonable or inexcusable delays would support a laches defense. Second, "'[t]he equitable doctrine of laches cannot be successfully invoked to defeat the right of the city to open the street which was dedicated to that use.'" *Bushmiaer*, 231 Ark. at 854 (quoting *City of Paragould v. Lawson*, 115 S.W. 379, 380 (Ark. 1908)). This general principle—which could be interpreted as a "city exception" or "public use/dedication" exception to the laches doctrine—strikes the Court as sound. Considering that "Arkansas Code Annotated section 14–301–301 (1987) gives cities of the first class the power and authority to vacate public

-18-

streets and alleys," *Thomas*, 52 Ark. App. at 27, it follows that the public's right of access to these places should not be cavalierly dispensed with, simply by referencing an equitable doctrine such as laches. Accordingly, Union Pacific's request for summary judgment on the affirmative defense of laches is **DENIED**.

### 3. Waiver

The defenses of waiver and estoppel, both of which have been asserted by Union Pacific, are similar. Waiver occurs when a party has "intentionally relinquished a known right." *Kimbrell v. Standard Ins. Co.*, 207 F.3d 535, 538 (8th Cir. 2000). Here, Union Pacific contends that "waiver [of the City's right to have the Crossing closed according to law] is the only reasonable conclusion" in this case, as "[t]he Mayor of Ozark, Todd Timmerman, acting in his capacity as the chief executive officer of the City, specifically requested that the crossing be removed." (Doc. 43, p. 38). This argument is rejected for the following reasons.

First, the Court disputes that a lone city official—even the city's mayor—may, as a matter of law, permanently waive the public's right to access an easement without first possessing: (1) the imprimatur of an affirmative vote of the city council and (2) the mandate of a city ordinance. *See* Ark. Code Ann. § 14–301–301. To suggest otherwise would be to potentially sanction the act of any public official who engages in rogue decision-making. Second, the evidence is undisputed that the City did not "intentionally relinquish a known right," *Kimbrell*, 207 F.3d at 538. According to State law, the only way that a city may relinquish the public's right to the use of a street, alley, or easement is through the procedures set forth in section 14-301-301 of the Arkansas Code. It is

-19-

undisputed that no public vote of the City Council was taken on the subject of closing the Crossing.  Moreover, five out of the seven Council members in office during the relevant time period were deposed in this case, and although a few recall being asked by Mayor Timmerman—after a Council meeting had already adjourned—whether they objected to closing the Crossing; neither Mayor Timmerman nor any other Council member claims that the Council voted during a regular, public session to close the Crossing. *See* Doc. 37-16, p. 7 (Timmerman Dep.); Doc. 37-19, p. 8 (Edgin Dep.); Doc. 41-15, p. 5 (McClellan Dep.); Doc. 37-1, p. 22 (McNutt Dep.); Doc. 37-8, p. 8 (Milam Dep.).

As Mayor Timmerman's unilateral acts do not bind the City with respect to a decision to vacate a public easement, no knowing waiver of the City's rights occurred, and Union Pacific's request for summary judgment on this affirmative defense is **DENIED**.

### 4. Estoppel

Union Pacific's last affirmative defense, equitable estoppel, "declares that a party who makes a representation that misleads another person, who then reasonably relies on that representation to his detriment, may not deny the representation." *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 659 (8th Cir. 1992).  For many of the reasons stated above with respect to the denial of the waiver defense, the Court rejects the argument that the City should be estopped from claiming that the Crossing was closed illegally and should be reopened.

A key component of the estoppel defense is that the party asserting the defense *reasonably* relied to its detriment.  Here, there is no genuine dispute of material fact that Union Pacific's reliance on Mayor Timmerman's oral request to close the

-20-

Crossing—without more—was unreasonable.  This is because Arkansas law requires that city officials and private companies like Union Pacific follow certain procedures before the two may act to deprive the public of a right of access.  The facts are undisputed that Union Pacific knew or should have known, by virtue of its own maps and records, that the Crossing was a public easement.  And Union Pacific concedes that it acted upon Mayor Timmerman's verbal authority when it removed the Crossing "shortly" after Union Pacific's Manager of Industry and Public Projects, Charlie Felkins, "spoke with Mayor Timmerman," and Mayor Timmerman "asked him to remove the crossing" (Doc. 43, p. 7).  By failing to insure that the City's easement had been vacated in compliance with Arkansas law, Union Pacific's actions and expenses incurred in removing the Crossing were done at the railroad's own peril, not the City's.

Under these circumstances, Union Pacific's request for summary judgment on the issue of estoppel must be **DENIED**.

### C.  Is a Permanent Injunction Justified?

Ozark requests not only a declaration as to its rights in the easement at the Crossing, but also injunctive relief.  The City asks that Union Pacific be required to expend its own funds to reopen the Crossing and return it to the condition it was in prior to its removal in 2001.  Now that the issue of liability has been decided in Ozark's favor, and all of Union Pacific's affirmative defenses have been dismissed, the City's request for injunctive relief in Counts II and III of the Amended Complaint, should be **GRANTED**.

The legal standard to consider when a party requests a permanent injunction "is essentially the same as for a preliminary injunction, except that to obtain a permanent

-21-

injunction the movant must attain success on the merits." *Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).  According to the Eighth Circuit's guidance in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, a district court must consider the following four factors when determining whether a permanent injunction should issue: (1) the threat of irreparable harm to the movant, (2) the balance between this harm and the harm to the other party if the injunction is granted, (3) the probability of movant's success on the merits, and (4) the public interest.  640 F.2d 109, 113 (8th Cir. 1981) (en banc).

Now that the Court has decided the merits of this case—the third *Dataphase* factor—in favor of the City, satisfying the rest of the *Dataphase* factors is a straightforward endeavor.  As for the first factor, the Court finds that the public faces irreparable harm as long as it continues to be denied access to the public easement at the Crossing.  This is because the easement was public for decades and was summarily removed without regard to State law.  As for the second and fourth *Dataphase* factors, although Union Pacific contends that both it and the public will suffer harm if an injunction is granted and the Crossing is reopened, these harms are balanced against the public harm in allowing the unlawfully closed Crossing to remain closed.  Although Union Pacific will likely incur several thousand dollars of costs in re-paving the Crossing for public use, and will also suffer some net inefficiencies in its overall operations when the Crossing is reopened, the Court finds that Union Pacific invited this result by its own failure to comply with State law.  As for the harm suffered by the public due to alleged inefficiencies in rail transportation that will supposedly result when the Crossing is reopened, this harm is balanced against the public's interest in having State-mandated procedures observed when public easements

-22-

are vacated.  On balance, the Court finds that the public benefit in reopening the Crossing outweighs any detriment the public will face in returning rail operations to conditions prior to the illegal closing.

Since all *Dataphase* factors weigh in favor of issuing a permanent injunction on Count III in this case, such relief will be **GRANTED**.  In addition, on Count II's charge of unreasonable interference with the City's easement, Pacific will be ordered to pay to the City all costs associated with returning the Crossing to an at-grade, public crossing, as it appeared prior to its removal in 2001.

### IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Union Pacific's Motion for Summary Judgment (Doc. 37) is **DENIED**, and Plaintiff City of Ozark's Motion for Partial Summary Judgment (Doc. 45) is **GRANTED** on Counts I, II, and III of the Amended Complaint for declaratory and injunctive relief.   Count V of the Amended Complaint, which is an alternative claim for relief, is **DENIED AS MOOT** in light of the Court's other rulings.

**IT IS FURTHER ORDERED** that the railroad Crossing at issue in this lawsuit is declared as a matter of law to have once been a public, at-grade crossing that was not closed according to Arkansas law.

**IT IS FURTHER ORDERED** that a permanent injunction is granted to City of Ozark. Within **120 days** of the entry of this Order, Union Pacific shall restore the Crossing at issue to its pre-2001 condition and pay all costs and expenses associated with reopening the Crossing.

Finally, the Court is unsure whether the case may be dismissed at this point, or whether other claims for relief remain for disposition. The City filed a request for *partial* summary judgment, not complete summary judgment, and in its Reply Brief, it stated somewhat cryptically that, if given the opportunity, it could "prove any damages that is [sic] suffered by the illegal acts of the Defendant in removing the at-grade public crossing without authority." (Doc. 63, p. 7). The Court is unclear what the nature of these "other damages" could be. The Court is also skeptical that the City could prove, without resorting to speculation, that it suffered or will suffer damages apart from the costs associated with reopening the Crossing. However, in an abundance of caution, **IT IS FURTHER ORDERED** that the City do the following by **December 30, 2015**: **either** (1) file a brief explaining and substantiating any and all claims for relief that the City believes are still outstanding and have not been fully resolved by this Order, **or** (2) file a document averring that no other claims remain and that the case is ripe for dismissal. If the City submits a brief in support of a claim for damages or other relief on December 30, 2015, Union Pacific's response will be due no later than **January 8, 2016**.

**IT IS SO ORDERED** on this __10th__ day of December, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

-24-